Ann E. Menasche, Esq. (SBN 74774)
**LAW OFFICE OF ANN E. MENASCHE**
1901 First Avenue, Suite 100
San Diego, CA 92101
Phone: (619) 798-6835
Fax: (619) 702-7073
Email: ann@bulldogforjustice.com

(Additional Counsel listed on following page)

## U.S. DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY BRADLEY, KAREN ABOOD, TOSHA ALVARADO, TIMOTHY ALLEN, LIAM BURTON, PAUL SCALLAN, JOHN BORJA, AND LAURA ZALETA<br><br>        Plaintiffs,<br><br>    vs.<br><br>CITY OF SAN DIEGO, DREAMS FOR CHANGE, AND DOWNTOWN PARTNERSHIP,<br><br>        Defendants. | Case No.:<br><br>**'25CV2186 AGS MMP**<br><br>**COMPLAINT FOR INJUNCTIVE, DECLARATORY, and MONETARY RELIEF**<br><br>**JURY TRIAL REQUESTED** |

*Additional Plaintiffs' Counsel:*

Geneviéve L. Jones-Wright, Esq., LL.M. (SBN 235168)
**COMMUNITY ADVOCATES FOR JUST AND MORAL GOVERNANCE**
6549 Mission Gorge Rd., Suite 379
San Diego, California 92120
Phone: (619) 736-0179
Email: Director@MoralGovernance.org

**DREHER LAW FIRM**
Robert Scott Dreher (SBN 120527)
350 West Ash Street, Suite 101
San Diego, CA 92101
Phone: (619) 230-8828
Email: Scott@DreherLawFirm.com

**GRUMET LAW**
Elizabeth Grumet, Esq. (SBN 276029)
1901 First Avenue, Suite 414
San Diego, CA 92101
Phone: (760) 809-5768
Email: Liz@GrumetLaw.com

Brian L. Burchett (SBN1347570)
**THE BURCHETT LAW FIRM, PC**
605 C Street, Suite 300
San Diego, California 92010
Phone: (619) 239-8431
Fax: (619) 639-1125
Email: brian@theburchettlawfirm.com

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

## INTRODUCTION

1. Plaintiffs are eight unhoused people with disabilities who, having no other options for affordable housing or safe appropriate shelter, and to avoid the constant threat of harassment, sweeps, and arrest by police, are forced to live in unhabitable, inhumane, and inaccessible conditions at one of two designated Camps established and operated by the City of San Diego ("City"). These Camps, operating under the Orwellian name of the "Safe Sleeping Program," are anything but safe for its residents. Instead, the Camps are rodent infested, and lack adequate food, shade and shelter from the elements, compelling its residents to stay in tents designed for ice-fishing or otherwise inappropriate for their intended use, often placed two feet apart or less, constituting a fire hazard, and to endure excessive and dangerous heat in the summer and fall, and cold and flooding in the winter, leaving tents and personal property often saturated with mold.

2. For Plaintiffs (and other residents with disabilities), these inaccessible and inhumane conditions and Defendants' failure and refusal to provide reasonable accommodations to meet disability-related needs, make living conditions in the Camps untenable, seriously threatening and aggravating mental and physical health. Plaintiffs ask that the Court order the Defendants to remedy these issues, comply with their duties, and properly and fully provide and maintain safe, sanitary, and suitable living conditions in these facilities.

## JURISDICTION AND VENUE

3. This court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because Plaintiffs claims arise under the laws of the United States. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law claims because Plaintiffs' state law claims are related to Plaintiffs' federal law claims, arise out of a common nucleus of operative acts and form part of the same case or controversy under Article III of the U.S. Constitution.

///

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

4. Venue is proper in this Judicial District because Plaintiffs' claims arise from unlawful conduct occurring in San Diego County, California.

**PARTIES**

**A. PLAINTIFFS**

5. Plaintiff **JEFFREY RYAN BRADLEY** is a 34-year-old unhoused person with disabilities that substantially limit major life activities. He used to run his own business until he was forced to stop due to his worsening disabilities. Mr. Bradley's disabilities include COPD, chronic pain in neck, back, face and hands resulting from multiple injuries and surgeries, and depression and anxiety. Having no alternatives available to him for affordable housing or safe accessible shelter—and to avoid the constant threat of harassment, sweeps, citations, and arrest by police—he has been living at the "Safe Sleeping Program" at the "O lot", located at Park Blvd. and Wieber Avenue (hereinafter "O lot), since on or about May 30, 2024, and currently resides at the "O lot". Mr. Bradley's mental health condition is aggravated by the overcrowded and unsanitary and unsafe conditions, and lack of privacy at the camp. His physical disabilities are aggravated when he is required to walk up the hill at the camp due to the shuttle services' limited hours of operation. Mr. Bradley meets the definition of "chronically homeless", as defined by the regulations issued by the U.S. Department of Housing and Urban development ("HUD"). 24 C.F.R. §91.5. Mr. Bradley is also a qualified individual with disabilities within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12102; the Fair Housing Act, 42 U.S.C. §3602(h); and the California Fair Employment and Housing Act ("FEHA"). California Government Code §12926.

6. Plaintiff **KAREN ABOOD** is a 53-year-old unhoused person with disabilities that substantially limit major life activities. Her disabilities include PTSD, anxiety disorder, depression, and chronic migraine headaches. She is taking psychiatric medication for her disabilities. Ms. Abood lost her housing as a result of a divorce. Having no reasonable alternatives for affordable housing or safe accessible shelter

available to her—and to avoid the constant threat of harassment, sweeps, citations, and arrest by police—she has been living at the "Safe Sleeping Program" at the "O lot" since on or about May 30, 2024, and currently resides at the "O lot". Ms. Abood experiences aggravation of her mental health condition due to the overcrowded, unsanitary, and unsafe conditions, and lack of privacy at the camp. Ms. Abood meets the definition of "chronically homeless" as defined by the regulations issued by the HUD. 24 C.F.R. §91.5.  Ms. Abood is also a qualified individual with disabilities within the meaning of the ADA, 42 U.S.C. §12102; the Fair Housing Act, 42 U.S.C. §3602(h); and the FEHA. California Government Code §12926.

7.  Plaintiff **TOSHA ALVEREZ** is a 36-year-old unhoused person with disabilities that substantially limit major life activities. Her disabilities include major depression, ADHD, mania, anxiety disorder and learning disabilities. She also is neurodivergent. She has an assistance animal (a cat), that provides her with necessary emotional support. Having no alternatives available to her for affordable housing or safe accessible shelter, and to avoid the constant threat of harassment, sweeps, citations, and arrest by police, she has been living at the "Safe Sleeping Program" at the "20th & B lot" (hereinafter "B lot") located at 26th Street and Pershing Drive, since on or about October of 2023 and currently resides at the lot. She became pregnant during her stay and was temporarily transferred to a hotel by an adoption agency, for sake of the health of her and her unborn child, due to the poor, unsafe living conditions at the "B lot". After giving birth and giving up her child for adoption, she had no other options but to return to the "B lot." The poor, overcrowded, unsanitary and unsafe conditions at the Camp aggravate her mental health conditions. Ms. Alvarez meets the definition of "chronically homeless" as defined by the regulations issued by the HUD. 24 C.F.R. §91.5.  Ms. Alvarez is also a qualified individual with disabilities within the meaning of the ADA, 42 U.S.C. §12102; the Fair Housing Act, 42 U.S.C. §3602(h); and the FEHA. California Government Code §12926.

///

8. Plaintiff **TIMOTHY ALLEN** is a 55-year-old unhoused individual with disabilities that substantially limit major life activities. His disabilities include depression, anxiety, cellulitis, and a chronic staph infection. Mr. Allen relies on an emotional support animal (a puppy), to help manage his disabilities. Mr. Allen worked in a career as a machine operator before becoming homeless after he lost his job and his unemployment ran out.  Having no alternatives available to him for affordable housing or safe, accessible shelter—and to avoid the constant threat of harassment, sweeps, citations, and arrest by police—he has been residing at the "Safe Sleeping Program" at the "B lot", since on or about November 15, 2024. Mr. Allen's mental health condition is aggravated by the poor, overcrowded, unsanitary and unsafe conditions at the Camp. Mr. Allen has been temporarily exited (removed) from the program without proper advanced notice nor a hearing, shortly following a dispute with Defendants regarding a request for reasonable accommodation for his emotional support animal. Mr. Allen is a qualified individual with disabilities within the meaning of the ADA, 42 U.S.C. §12102; the Fair Housing Act, 42 U.S.C. § 3602(h); and the FEHA Cal. Gov't Code §12926.

9. Plaintiff **LIAM BURTON** is a 38-year-old unhoused individual with disabilities. His disabilities include chronic post-traumatic stress disorder (CPTSD), anxiety, major depressive disorder (MDD), and unspecified dissociative disorder (UDD) which necessitate that he live in a space with adequate privacy. Mr. Burton has been diagnosed with anxiety, MDD, CPTSD, and UDD. Mr. Burton has dedicated many years to helping underserved communities as a peer support specialist, offering peer support, food and resources to unhoused individuals full time, even as he navigates being unhoused himself. Since residing at "B Lot," the alarming lack of adequate security has caused Mr. Burton to become increasingly hypervigilant, significantly worsening his anxiety. Additionally, the lack of personal space has exacerbated his PTSD symptoms. Due to Mr. Burton's disabilities, the ongoing mistreatment he has witnessed at "B Lot"—including staff belittlement, threats, and the lack of security—

has significantly worsened his condition. Since being placed at the lot, his disabilities have deteriorated, leading to serious medical complications. Having no alternatives available to him for affordable housing or safe, accessible shelter—and to avoid the constant threat of harassment, sweeps, citations, and arrest by police—he has been residing at the "Safe Sleeping Program" at the "B lot" since on or about October 27, 2025. Mr. Burton is a qualified individual with disabilities within the meaning of the ADA, 42 U.S.C. §12102; the Fair Housing Act, 42 U.S.C. §3602(h); and the FEHA, Cal. Gov't Code §12926.

10. Plaintiff **PAUL SCALLAN JR.** is a 50-year-old unhoused individual with disabilities that substantially limit major life activities. His disabilities include neuropathy in his left hand, post-traumatic stress disorder (PTSD), and ADHD. Mr. Scallan is a marine veteran and former paralegal. Having no alternatives available to him for affordable housing or safe, accessible shelter—and to avoid the constant threat of harassment, sweeps, citations, and arrest by police—he has been residing at the "Safe Sleeping Program" at the "B lot," since on or about August 14, 2024. Due to misinformation given to Mr. Scallan by "211" when he initially was referred to the camp, he believed that he could register and check into the program by showing up in person. This information turned out to be incorrect, and Mr. Scallan had to live in the woods next to the camp for two weeks as he waited to be admitted. During that time, while Mr. Scallan was at a day labor job, San Diego's Environmental Services came to his tent area, posted a three-hour notice, and threw away all of his belongings, including the silver urn with his mother's ashes, his laptops, birth certificate and driver's license. This frustrated Mr. Scallan's efforts to get his life on track and secure long-term housing. The poor and unsanitary conditions of the camp aggravate his disabilities. Mr. Scallan is a qualified individual with disabilities within the meaning of the ADA, 42 U.S.C. §12102; the Fair Housing Act, 42 U.S.C. §3602(h); and the FEHA, Cal. Gov't Code §12926.

///

11. Plaintiff **JOHN BORJA** is a 49-year-old unhoused individual with mental health and physical disabilities, including diabetes and sleep apnea. His doctor has prescribed use of a CPAP machine, without which he is at risk of serious injury or death. He is currently prescribed psychiatric medication and has been found disabled and unable to work by the Social Security Administration since 2005. Previously, he has worked as a cashier at a 7-11 store and at a 76-gas station. Having no alternatives available to him for affordable or safe, accessible housing—and in order to avoid constant threats of harassment, sweeps, citations, and arrest by law enforcement—Mr. Borja has been residing at the "Safe Sleeping Program" at the "B lot,", since on or about October 22nd, 2024. Mr. Borja has been prevented from using his CPAP machine at the Camp and has been denied an appropriate diet for his diabetes, placing him at grave risk of harm. The poor, overcrowded conditions at the camp also aggravate his mental health disabilities. Mr. Borja is a qualified individual with disabilities under the ADA, 42 U.S.C. §12101; the Fair Housing Act, 42 U.S.C. §3602(h); and the FEHA, Cal. Gov't Code §12926.

12. Plaintiff **LAURA ZALETA** is a 59-year-old unhoused individual with disabilities that substantially limit major life activities. Her disabilities include spinal compression, bipolar disorder, and post-traumatic stress disorder (PTSD). Ms. Zaleta worked most of her life before her disabilities worsened in the restaurant industry, working her way up from washing dishes in restaurants to managing restaurants. Ms. Zaleta resides in the ADA-designated area of the "B" lot and relies on a walker for mobility. Having no alternatives available to her for affordable housing or safe, accessible shelter—and to avoid the constant threat of harassment, sweeps, citations, and arrest by police—she has been residing at the "Safe Sleeping Program" at the "B lot," since on or about May of 2024. Due to her disability, she requires access to the designated handicap-accessible showers. However, with only one such shower available, and it being out of order for an extended period, Ms. Zaleta spent two months unable to bathe—resulting in painful sores developing on her body. She currently

navigates the uneven pavement of the "B lot" using her walker, but the poor ground conditions have aggravated her physical condition and have caused two of her walkers to break since she began living there.  Ms. Zaleta has had difficulty getting in and out of the shuttle at the Camp with her walker.  The substandard living conditions, overcrowding, and lack of privacy have also aggravated her mental health. Ms. Zaleta is a qualified individual with disabilities under the Americans with Disabilities Act (ADA), 42 U.S.C. §12102; the Fair Housing Act, 42 U.S.C. §3602(h); and the FEHA, Cal. Gov't Code §12926.

**B. DEFENDANTS**

13. Defendant **CITY OF SAN DIEGO** is now, and at all times herein mentioned in this Complaint, was a local government agency and subdivision of the State of California. Defendant City of San Diego operates, manages, and controls its "Safe Sleeping program" in two locations- Lot B and Lot O, through the City's Homelessness Strategies and Solutions Department. City of San Diego is responsible for the conditions at these lots, and is further responsible, along with the City's ADA office, for the failure and refusal to make timely and adequate reasonable accommodations to Plaintiffs and to provide accessible program and common areas. Further, Defendant City of San Diego is responsible for failing to provide a sufficient number of safe, adequate accessible indoor shelters and affordable housing units, and for the enforcement by its police department of various ordinances used to harass, sweep, cite, arrest and/or remove unhoused people and their belongings from City parks and streets, even though they have no options for safe shelter. The CITY is also responsible for coercing Plaintiffs into accepting a spot in the "Safe Sleeping" program as the only alternative provided them to avoid police harassment, sweeps, citation and arrest. Defendant City of San Diego has entered into contractual relationships with Defendants Dreams for Change and Downtown Partnership, delegating portions of the work in operating the two camps- Lot B and Lot O campsites - under the City's continued overall supervision and control.

14. Defendant **DREAMS FOR CHANGE** is and at all times herein mentioned was a non-profit agency registered in the State of California that has been contracted by the City to assist in operating the two homeless Camps. It is jointly responsible with the City for the unsafe and unlivable conditions of the Camps it helps operate and for the failure and refusal to make timely and adequate reasonable accommodations for the Plaintiffs and to install and maintain accessible amenities and common areas that are readily achievable.

15. Defendant **DOWNTOWN PARTNERSHIP** is, and at all times herein mentioned was, a non-profit agency registered in the State of California that has been contracted by the City to assist in operating Lot O. It is under contract with the City of San Diego and jointly responsible with the City and Defendant Dreams for Change for the unsafe and unlivable conditions of the Camp at Lot O that it helps operate.

16. Defendants and each of them are agents, servants and employees of each other and in the actions and inactions alleged herein were acting in the course and scope of their agency, service and employment and, unless otherwise indicated, are jointly liable for the claims described herein.

## STATEMENT OF FACTS

**A. The Affordable Housing and Homelessness crisis, and Corresponding Shelter shortage.**

17. Plaintiffs are on small, fixed incomes, are unable to work or work full-time due to disabilities, and have therefore been priced out of an increasingly unaffordable local housing market.

18. Plaintiffs allege, on information and belief, that the growing homelessness crisis in San Diego is directly linked to the lack of affordable housing. As of 2024, the average cost of a studio apartment is around $2,160 per month, while SSI benefits for an individual with disabilities only pays $1,182.94 per month. Without rental subsidies or the development of more affordable housing, Plaintiffs have no practical way of escaping their homelessness. As of early 2024, nearly 58,000 people were seeking

section 8 vouchers in the city of San Diego and no new vouchers had been issued since 2022. (Voice of San Diego, May 3, 2024.) The wait for benefits has been described as 15 years or more.

19. The 2024 Point in Time Count conducted by the Regional Taskforce on Homelessness (RTFH), counted an unsheltered population of 3,489- a 6.2% increase since 2023. The total homeless population was counted as 6,783. These figures consist of people contacted in one night and are generally understood to be a significant undercount. Though the counted homeless population fell 6.6% according to the 2025 Point in Time Count, it is still larger than at any point from 2014 through 2023.

20. From January through March 2025, the homeless population in San Diego began growing again, with more people becoming homeless than those who had found housing.

21. As of October 2024, the City funded 1,900 beds in indoor shelters. As of the end of 2024, San Diego has lost more than 600 of these beds. For the first time, they are being "replaced" by 263 shelter beds and an expansion of the "Safe Sleeping program" by 180 tent spaces at Lot O and by 50 tent spaces at Lot B. There are currently 767 tents in the "Safe Sleeping Program," increasing the overcrowding at the sites. That leaves only 1563 indoor beds, for a homeless population of over 6,000, and an unsheltered population of more than twice the number of beds.

22. The City's indoor homeless shelters are often inaccessible for people with disabilities, aggravating their physical and mental health conditions, due to complete lack of privacy and overcrowding, and risking their health and even lives through the easy spread of disease such as Covid.

**B. City Ordinances Criminalize Homelessness and Compel Plaintiffs and other Unhoused People into City sanctioned and operated Camps.**

23. The City of San Diego has enacted and/or enforced a series of municipal ordinances and state laws that criminalize basic, life-sustaining activities of unhoused individuals—such as sleeping, sitting, storing belongings, and camping in public

spaces. These laws are routinely enforced to exclude unhoused people from public areas and to coerce them into accepting placement in camps like the "Safe Sleeping Program." The following statutes and ordinances illustrate this pattern of criminalization:

**San Diego Municipal Code**

a. San Diego Municipal Code §54.0105: unlawful for any person to place, or allow to remain, any goods, wares, baggage, personal property or merchandise on any sidewalk or curb, between the outer edge of the sidewalk or curb and the property line.

b. San Diego Municipal Code §54.0110 "Encroachment": It is unlawful for any person to erect, place, allow to remain, construct, establish, plant, or maintain any vegetation or object on any public street, alley, sidewalk, highway, or other public property or public right-of-way, except as otherwise provided by this Code.

c. San Diego Municipal Code §63.0404: The ordinance prohibits individuals from camping or maintaining encampments on public property without express authorization from the City Manager, regardless of shelter availability. It further bans encampments that pose risks to public health or safety, interfere with government operations, or are situated within restricted areas, including within two blocks of schools, shelters, waterways, hazardous parks, or transit hubs, provided appropriate signage is posted.

d. San Diego Municipal Code §63.0406: provides for removal of personal property, camping paraphernalia, and all other property, contraband, litter, and waste found at an encampment or at a location where a person is engaged in unlawful camping.

**California Penal Code**

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

a. Cal. Penal Code §647(e): "criminalizing "lodg[ing] in any building, structure, vehicle, or place whether public or private, without the permission of the owner or person entitled to the possession or in control of it"

b. Cal. Penal Code §148(a): prohibits willfully resisting, delaying or obstructing agency or law enforcement personnel, from issuing citations when an "individual refused to vacate an encampment" after "notice".

c. Cal Penal Code §372: prohibits "unlawfully obstruct[ing] the free passage or use, in the customary manner, of any…public park, square, street, or highway"

d. Cal. Penal Code §647(c): criminalizing "willfully and maliciously obstruct[ing] the free movement of any person on any street, sidewalk, or other public place or on or in any place open to the public".

**C. Unsafe and inhumane conditions prevail at the "Safe Sleeping Program."**

24. The "Safe Sleeping Program" is inherently unsafe for the Plaintiffs and others that reside at the camps, threatening health and even life. The Program is especially inaccessible to and uninhabitable for people with disabilities, aggravating their mental and physical health conditions. The camp locations themselves are inappropriate for outdoor living. Lot B is in a flood plain and the O lot is steep, entirely gravel, and becomes muddy when it rains. Neither Lot has any natural shade. The terrain is inaccessible and difficult and dangerous to navigate for people with mobility impairments, including people who use wheelchairs, walkers or canes. Ice tents without floors that were originally assigned to the residents, and the new tents that replaced them, are both inappropriate for their intended use in San Diego. The tents have been placed, in most cases—two feet apart or less—limiting privacy, posing a fire hazard, and making the spread of rodent infestation, other vermin, and disease, far likelier. Though there are limited shade structures placed in the common areas, there is

no shade for the tents and no way to cool the inside space of the tents during hot weather, causing residents to risk hyperthermia, nor is there any way to retain any warmth inside the tents in winter. Individual canopies are forbidden because of the proximity of the tents to each other, due to fire danger. Tent temperatures can go up to 110 degrees Fahrenheit during the summer and fall. There is no heat available to stay warm in winter, in or outside the tents, placing Plaintiffs and other residents at risk for hypothermia. The tents provide little to no protection against rain. The heavy rains in 2024 forced the residents of B Lot to be evacuated, and the residents were left with wet and moldy tent space and belongings.

25. Security is minimal to non-existent at the camps, with no guards on duty during much of the time, and non-residents able to get on the premises, some of whom have threatened residents with physical and/or sexual violence. Upon information and belief, at least one "guard" working in Lot B wore an ankle monitor and frequently sexually harassed female residents, requiring "favors" in exchange for food or necessities. The campsites are located far away from resources, requiring that Plaintiffs and other residents access a shuttle to get to Park Blvd. so they can walk or seek bus transportation to obtain medical care or find food. The shuttle itself is not accessible to all residents, has limited hours, and there are not enough of them to allow for daily trips outside the camp for everyone. Only two small meals are provided to residents, insufficient to meet the daily nutritional and caloric needs of the residents, some of whom may be unable, due to disability or health, to leave the camp for the day to supplement their diet, resulting in camp residents suffering hunger and malnutrition. There is no safe secure place provided to store non-perishable food away from rodents and other animals and no access to refrigeration or cooking facilities. There was at least one instance of widespread food poisoning in Lot O, following a communal meal, as well as multiple reports of residents in both Lot O and Lot B becoming ill after consuming the provided food. Plaintiffs have all suffered from unsafe and inadequate nutrition while living at the Lots.

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

26. Though both Lots B and O have experienced rodent problem, Lot O has suffered severe rat infestation, where rats and their droppings have been found in tents, under the slabs beneath the tents and even getting into the water supply.  Residents in Lot O have suffered rat bites and scratches, with rats crawling over them at night, and some residents, including the two of the Plaintiffs who reside there, became ill following the exposure. In September and October of 2024, over a hundred residents signed a petition to the City demanding something be done about the rats. A press conference was held on October 4, 2024, to bring the problem to the attention of the public and the City. Following the press conference, the City took some steps to address the problem by calling in an exterminator.  However, though somewhat improved, there is still no safe place to store food, and the rats are still present at O camp, posing a risk to the residents.

27. "Safe sleeping" is in many respects less "safe' than the conditions facing those who have set up their own tents in other areas of downtown. Tents are usually placed a reasonable distance apart.  They are often placed under overhangs or in tunnels that provide some protection from sun and rain, moderating the temperature and conditions in the tents. They are also far closer to resources such as food and medical care, day centers or libraries to get warm or escape the heat during the day, and unhoused people in these tents have greater ability to cook and store food. In Plaintiffs' experience, rodent infestations are far less common on the streets than at these camps.

28. The ongoing conditions in the B and O camps violate numerous California and City of San Diego Health and Safety codes and regulations requiring the maintenance of safe and sanitary living conditions at shelters, and the timely correction of any violations, see California Health & Safety Code §§17974–17974.6, including §17974.1 (requiring inspection and notice for substandard conditions in homeless shelters), §17974.2 (imposing responsibility for correcting violations), and §17974.4 (civil liability for failure to correct); §17970.5 (requiring complaint-based inspections and verification of corrective actions for substandard dwellings including homeless shelters); and further violate codes requiring that shelters comply with state and federal

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

disability access laws, see California Health & Safety Code §19952 (requiring compliance with ADA and state accessibility standards); Defendants' actions and inactions resulting in these conditions were and continue to be grossly negligent or taken with reckless disregard for the health and safety of Plaintiffs and other residents at the Camp.

**D. Plaintiffs' Requests for Reasonable Accommodations and Defendants'**
**lack of timely, good faith, interactive process; Denial of disability access**

29. On or about April 2 and 3, 2024, Plaintiff Tosha Alvarado submitted requests for reasonable accommodations to the ADA Compliance and Accessibility Office, operated by Defendant City of San Diego. The request was forwarded to the ADA office by Mitchelle Woodson of Think Dignity and requested that responses be provided to her office.

30. Ms. Alvarado's request in summary contained the following:

    a. More space between her tent and others and to be permitted to use her own canopy, since her mental health symptoms were triggered by crowds and lack of privacy;

    b. That she be provided with adequate food—three meals a day—or, in the alternative, safe food storage and cooking facilities on site, as she is unable at times to leave the camp due to her disabilities to get food, and needs food to take her medication;

    c. An adequate reliable shuttle service to get to medical appointments.

31. Ms. Woodson never received any response from defendant City of San Diego to these two reasonable accommodation requests.

32. On September 3, 2024, Plaintiffs Jeffrey Bradley and Karen Abood submitted, through their attorney, Ann Menasche, a request for reasonable accommodations to the City's ADA Compliance & Accessibility Office.

33. Mr. Bradley's request in summary contained the following:

    a. A camp area free of rats and rat droppings that interfere with sleep

and aggravate his depression and anxiety;

    b. Access to clean air as the proximity to the freeway is aggravating his COPD.

    c. More space between his tents and others and to use his own Canopy as the lack of privacy and crowded conditions aggravate his anxiety.

34. Ms. Abood's request in summary contained the following:

    a. Camp area free of rats and rat droppings that aggravate her PTSD, anxiety and depression;

    b. An effective way of cooling her tent, such as allowing use of a canopy, as over 100-degree Fahrenheit temperatures aggravate her migraines.

    c. More space between her tent and others, and use of a canopy, since crowded conditions and lack of privacy aggravate her anxiety and PTSD.

35. Also on September 3, 2024, Plaintiffs' counsel, Ann Menasche, sent a letter to Teresa Smith, CEO of Dreams for Change, requesting reasonable accommodations, as stated above, on behalf of all three Plaintiffs.

36. Ms. Smith wrote again to Ms. Menasche on September 15, 2024, stating that she had shared the letter with the City, and the City "is working with our Program manager in regard to the requests that are out of our scope and require the City's intervention."

37. It was not until December 16, 2024, three months later, and subsequent to these Plaintiffs filing claims against the City as alleged below, that Plaintiffs Jeffrey Bradley and Karen Abood received written responses from the City to their reasonable accommodation requests. The identical responses, signed by Homelessness Strategies and Solutions Department Manager Karen Carter, reviewed the provisions of the "Safe Sleeping" program and suggested contacting their case manager with PATH[1], Kat

---

[1] PATH is a non-profit provider of homeless services that sometimes provides case management for homeless individuals who may be residents of "Safe Sleeping" program. They are not directly involved with the operation of the program.

Moore, "to advocate directly with Dreams for Change staff to help identify a site to reduce the number of surrounding tents and assist with your transition."

38. Plaintiffs' counsel contacted Kat Moore who referred the issue to her supervisor. There has been no further response or communication from either PATH, the City, or Dreams for Change, with regard to Mr. Bradley and Ms. Abood's accommodation requests.

39. No responses were ever received from the City to Tosha Alverez's written Reasonable Accommodations request.

40. Plaintiff John Borja submitted a request for reasonable accommodations to the Dreams for Change staff onsite at the "B" lot on multiple occasions while staying at the lot.

41. Mr. Borja's request in summary contained the following:

    a.  That the Dreams for Change staff at the "B Lot" cease unplugging his CPAP machine, which he relies on to sleep safely and prevent his airways from collapsing.

Mr. Borja's request to keep his medically necessary CPAP machine plugged in was ignored, resulting in ongoing, active, and substantial risk to his health & his life. He filed a formal grievance in December of 2024 with Dreams for Change, which was also ignored. Instead, staff mocked him and threatened him with being "kicked out" of the program.

42. Plaintiff Liam Burton submitted a request for reasonable accommodation to the Dreams for Change staff on or about June 26th, 2025.

43. Mr. Burton's request in summary contained the following:

    a.  That Dreams for Change staff at the "B Lot" provide him with increased privacy, as his PTSD is exacerbated by overcrowded environments.

44. The staff offered Mr. Burton a placement that still failed to provide the minimum level of privacy necessary to avoid aggravating his CPTSD.

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

45. Plaintiff Timothy Allen submitted a request for reasonable accommodation to the Dreams for Change staff on or about May 8, 2025.

46. Mr. Allen's request in summary contained the following:

    a. That the Dreams for Change staff at the "B Lot" allow him to keep his emotional support puppy, without requiring that the animal be neutered. Mr. Allen's request included written verification from his treating doctor of his need for the assistance animal, due to his disabilities.

    b. The Staff disregarded the request, was about to exit him, and only allowed Mr. Allen to stay at the camp with the puppy after Attorney Ann Menasche intervened.

    c. Shortly thereafter, he was exited from the lot on a ninety-day suspension, ostensibly for entering the lot after curfew and being "disrespectful" of staff, the latter of which he denies. Mr. Allen is informed and believes that both accusations were pretexts for the Staff's retaliatory action in exiting Mr. Allen in response to him exercising his right to request reasonable accommodations under the law. Plaintiff Allen was denied proper notice and opportunity to be heard prior to being exited. Mr. Allen has had no place to go but to return to the streets and risk arrest for violation of the City's homeless ordinance.

47. Plaintiff Laura Zaleta has spinal compression, which requires her to use a walker to navigate the camp. She is also reliant on the only available accessible shower, as it is the only shower she can safely use. The only accessible shower at B lot was out of service for two months, despite repeated complaints. As a result, Laura developed sores on her body. It was not repaired until the Health Department was notified.

48. Ms. Zaleta has submitted multiple complaints about the rough terrain at the "B Lot," but her concerns have repeatedly been ignored. As a result, she has experienced worsened pain and an exacerbation of her condition and also has broken two walkers navigating the uneven ground.

**E. Plaintiffs' Submission of Timely Claims to the City.**

49. On November 6, 2024, Plaintiffs Jeffrey Bradley, Karen Abood and Tosha Alvarado each submitted claim forms to the City of San Diego Risk Management Department claiming damages for ongoing violations of their rights.

50. On December 19, 2024, said Plaintiffs provided supplemental information regarding the dates of loss clarifying that the claims for substandard conditions began on the dates each of them arrived at the camps respectively, and continuing thereafter; and that the claims for failure to provide reasonable accommodate arose on the dates each submitted his or her request and continuing thereafter.

51. On July 10, 2025, Plaintiffs ALLEN, BURTON, SCALLAN, BORJA, and ZALETA submitted Claim forms to the City regarding their treatment at the Camps. Because these claims are ongoing, they are considered timely filed under Government Code §911.2.

**F. Defendants' retaliatory actions towards plaintiffs in response to requests for reasonable accommodation and assertion of their rights.**

52. Plaintiff Jeffrey Bradley requested reasonable accommodations for his disabilities from the City and Dreams for Change as alleged above.

53. On September 23, 2024, Attorney Ann Menasche sent an email to Teresa Smith, CEO of Dreams for Change, regarding the request that Defendants approve Mr. Bradley's reasonable accommodation requests. The day after this communication, staff at the "O lot" informed Mr. Bradley that they intended to search his tent to ensure he did not possess any prohibited items, even though there were no grounds for doing so.

54. Mr. Bradley objected, stating that the staff had no right to search his personal belongings without cause.

55. Shortly thereafter, while Mr. Bradley was away from the camp for less than two weeks, staff at the "O lot" discarded his personal belongings and allowed other residents to take what remained.

///

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

56. Upon Mr. Bradley's return, he requested a tent and sleeping bag, but staff stated they were unable to provide these items.

57. As a result, Mr. Bradley had to rely on blankets obtained from other residents, which were the only items available for him to sleep with at night.

58. On or about October 4, 2024, Plaintiff Karen Abood spoke to the media regarding the unsuitable and inhumane conditions at the camp, where unhoused individuals were being compelled to reside to avoid criminalization.

59. Following her return to the camp, staff at the "O lot" began referring to Ms. Abood as the "media girl" and confronted her by stating, "Why would you do that? Don't you want to continue living here?"

60. Shortly after Attorney Menasche's intervention regarding Plaintiff Timothy Allen's reasonable accommodation requested as described above, Mr. Allen was exited from the "B lot" for allegedly returning past curfew—a minor rule violation for which other residents are not typically removed from the program.

61. Plaintiff John Borja was also threatened with being exited for complaining about the unplugging of his C-PAP machine.

62. In or around April of 2025, Plaintiff Paul Scallan was retaliated against by staff, who, after telling Mr. Scallan he needed to switch tents, demanded he place all his personal property into two small bins, or they would be thrown away. He reported that he may be moving to VA housing soon and expressed his concerns, noting that he believed it was unconstitutional to throw his personal property away, and underscored that he did not want any of his belongings thrown away. The staff member told Mr. Scallan he was a "thorn in her ass" and marched away with his tent. Mr. Scallan had to leave for the evening and assumed he would be issued a new tent the following day.

63. Instead, in retaliation for Mr. Scallan reporting his concerns, staff removed his tent and left his personal property out in the open on the wood platform where his tent had been located. Mr. Scallan checked in with staff every day for twelve days for his

new tent. Because staff inexplicably would not issue him a tent, he ended up back on the streets in downtown San Diego.

64. Mr. Scallan was so desperate to get a tent and secure his belongings that he went onto the "Nextdoor" app and shared that Dreams for Change was refusing to issue his tent. Upon information and belief, several concerned citizens called the mayor's office to report their concerns. After Mr. Scallan's public campaign to be treated fairly, he finally received a new tent, twelve days after staff had removed his tent.

65. Despite that Mr. Scallan was issued a new tent, residents overheard staff being instructed to throw all of Mr. Scallan's personal property away in a dumpster, which they did.

66. The incidents outlined above reflect a pattern of retaliation by Defendants in response to Plaintiffs' exercise of their protected rights.

## FIRST CLAIM FOR RELIEF
### [Fair Housing Act, 42 U.S.C. §3604 et seq.]
### Against All Defendants

67. Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

68. Plaintiffs plead this claim against all Defendants. The City's "Safe Sleeping Program" operated at "B Lot" and "O Lot" are designed or intended for occupancy by homeless persons as their residences. Plaintiffs and other homeless persons accepted into the program are assigned specific tents to live in which are available to them 24 hours per day. Residents stay for months or years at a time and have nowhere else to return to. As in many other government subsidized housing programs, the cost of rent for residing at the dwelling units is paid for by City and State funds, which Plaintiffs contribute to as taxpayers.

69. Because the tents and common areas at "B Lot" and "O Lot" are more than a place of temporary sojourn or transient visit for its residents, they are therefore

///

70. "dwellings" as defined by the Fair Housing Amendments Act (FHAA) 42 U.S.C. §3602(b). See 24 C.F.R. §100.201; *Woods v. Foster*, 884 F. Supp. 1169, 1173-1174).

71. The FHAA makes it unlawful for a housing provider "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter, a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or any person associated with that buyer or renter." 42 U.S.C. §3604(f)(1); 24 C.F.R. §100.202(a).

72. The FHAA also makes it unlawful to fail to design and construct multi-dwelling units for first occupancy after March 13, 1991, so that public use and common use portions of the dwellings are readily accessible and usable by persons with disabilities. 42 U.S.C. §3604(f)(3)(c).  There must be an accessible route into and through the dwelling. 56 FR 9472. "Accessible route" means "a continuous unobstructed path connecting accessible elements and spaces in a building…that can be negotiated by a person with a severe disability using a wheelchair and that is also safe for and usable by people with other disabilities…" 53 FR 4492, §100.201.

73. It is further unlawful under the FHAA "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person; or a person residing in or intending to reside in that dwelling after it is sold or made available; or any person associated with that person." 42 U.S.C. §3604(f)(2); 24 C.F.R. §100.202(b).

74. Discrimination under the FHAA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604(3)(B); 24 C.F.R. §100.204(a); U.S.C. §3604(f)(7)(A).

75. "B" and "O" camps were constructed for first occupancy after March 13, 1991.

76. Plaintiffs are qualified individuals with disabilities within the meaning of FHAA.

77. Defendants' actions and omissions discriminate against Plaintiffs because of their disability in violation of the FHAA. Defendants' discriminatory conduct includes but is not limited to:

- Failure to design and construct the properties utilized for the "Safe Sleeping Program" so that the common use portion of the camps and the areas for entering and leaving the camps are readily accessible and usable by people with disabilities with an accessible route;

- Failure to provide timely and appropriate responses to Plaintiffs' requests for reasonable accommodation, instead ignoring the requests, deflecting the responsibility on other defendants and/or responding many months later merely describing the current program offerings without offering modifications to meet Plaintiffs' disability related needs; and

- Failing, delaying, or improperly conducting maintenance to prevent the proliferation of rats, mice and other vermin that threaten the health and safety of all the residents but disproportionately impact Plaintiffs and others with physical and mental disabilities.

- Failing to implement lawful reasonable accommodation policies to ensure an established process, clear allocation of responsibility, and prompt and appropriate responses to the reasonable accommodation requests of Plaintiffs and other residents with disabilities so that they have equal access to the benefits of the "Safe Sleeping" shelter program.

78. The Fair Housing Act, 42 U.S.C §3617 prohibits coercion, intimidation, threats, or any interference with any person in the exercise of their protected rights under the Fair Housing Act.

79. Plaintiffs engaged in protected activity under the Fair Housing Act, including

requesting reasonable accommodations and speaking out against unlawful housing practices. 42 U.S.C. § 3617. In response, Defendants retaliated against plaintiffs by threatening eviction ("exiting"), eviction, destroying personal property, denying access to basic shelter or services, and subjected Plaintiffs to targeted harassment, which is in violation of 42 U.S.C. §3617.

80. Defendants' retaliatory conduct was intended to deter Plaintiffs from exercising their rights under the Fair Housing Act, including the right to request reasonable accommodations, and from speaking out against the unsafe, inaccessible and discriminatory conditions within the camps. 42 U.S.C. §3617.

81. Defendants' discriminatory and wrongful conduct is ongoing. Defendants' violations of the FHAA have harmed and will continue to harm Plaintiffs in the future.

82. Defendants maintain a pattern and practice of denying Plaintiffs full and equal access to their tents by failing to maintain accessible paths of travel in and out of the camps. Plaintiffs have no adequate remedy at law to redress the wrongs set forth herein. Declaratory and injunctive relief are therefore appropriate remedies.

83. As a direct and proximate cause of defendants' discriminatory conduct, Plaintiffs have suffered and continue to suffer emotional distress, loss of civil rights, physical harm and exacerbation of their disabilities entitling them to actual damages.

84. The conduct of defendants and each of them was willful, oppressive, and/o fraudulent and involved reckless disregard or callous indifference to Plaintiffs' rights.

85. Based on the foregoing, Plaintiffs are entitled to actual damages, punitive and exemplary damages and injunctive and declaratory relief, attorneys' fees and costs as set forth below.

**SECOND CLAIM FOR RELIEF**
**Violation of Substantive Due Process – Reckless Endangerment**
**(Fourteenth Amendment; 42 U.S.C. §1983)**
**Against Defendant CITY OF SAN DIEGO**

86. Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

87. Under the Substantive Due Process Clause of the Fourteenth Amendment, the state deprives a person of a substantive due process right if it affirmatively places the person in a position of danger. *Wood v. Ostrander*, 875 F. 2d 578, 583 (9th Cir. 1989).

88. Defendant City of San Diego has acted and continues to act affirmatively as described herein and with reckless disregard or deliberate indifference to Plaintiffs' health and safety to coerce Plaintiffs, lacking viable indoor shelter and affordable housing options and facing the constant threat of police harassment, citation and arrest by the City, into a highly dangerous situation – a residence in the City-operated highly unsafe "Safe Sleeping Program."

89. Residing in the tent encampments elevates the risk of harm to Plaintiffs and places them in grave danger of serious physical illness and even death from exposure to rodents and their droppings, mold, malnutrition, food poisoning, hypothermia, hyperthermia, and fire, among other serious and life-threatening conditions prevalent or at high risk of occurring at the camps. In addition, the poor and overcrowded living conditions of the City's camps aggravate Plaintiffs' mental and physical disabilities, causing additional and ongoing pain and suffering.

90. Plaintiffs have no adequate remedy at law for the violations stated herein and are therefore entitled to injunctive, declaratory, and equitable relief. Plaintiffs are also entitled to attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
**Violation of Title II Americans with Disabilities Act**
**Against Defendant CITY OF SAN DIEGO**

91. Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

92. Title II of the ADA, 42 U.S.C. §12132 provides: [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

93. Plaintiffs are "qualified persons with disabilities" as defined under the ADA. 42

U.S.C. §12102; 42 U.S.C. §12131; 28 C.F.R. §35.104.

94. Under the ADA's broad language, a "program, service, or activity" includes with its scope "anything a public entity does*." Yeskey v. Pennsylvania Dep't of Corr*., 118 F. 3d 168, 171 & n. 5 (3d Cir. 1997), aff'd 524 U.S. 206 (1998) (quoting 28 C.F.R. Pt. 35, App. A, preamble to ADA regulations.)

95. The City's "Safe Sleeping Program" is a service, program or activity of the City of San Diego.

96. Title II protects people with disabilities against facially neutral policies that burden people with disabilities more than others, by requiring that the public entity provide reasonable modifications to avoid the discrimination unless the public entity can demonstrate that such modifications would result in a fundamental alteration of the program. 28 C.F.R. §35.130(b)(7); *Crowder v. Kitagawa*, 81 F. 3d 1480 (9th Cir. 1996).

97. Under 42 U.S.C. §12203, it is unlawful for any public entity to discriminate against, coerce, intimidate, threaten, or interfere with any individual who exercises their rights protected under the ADA.

98. By failing and refusing to reasonably modify its policies and practices as described herein to allow Plaintiffs the necessary accommodations they requested, the City of San Diego has discriminated against plaintiffs based on their disabilities.

99. Title II regulations interpreting the ADA prohibit a public entity from utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability. 29 C.F.R. §35.130.

100.    Defendant's policies and practices in administering its "Safe Sleeping Program" has the effect of discriminating against and imposing disproportionate burdens on Plaintiffs based on their disabilities, aggravating their physical and mental health conditions, and denying them the full benefits and amenities of the Program enjoyed by and available to people without disabilities.

101.    In carrying out Defendant's policies and practices as described herein,

Defendant has utilized criteria or methods of administration that have the effect of subjecting Plaintiffs to discrimination based on their disabilities. 29 C.F.R. §35.130(b)(3); §42 U.S.C. §12203.

102.    In response to Plaintiffs' requests for reasonable accommodations, Defendant engaged in retaliatory acts, including but not limited to threats of eviction, actual eviction or suspension, denial of essential services, and confiscation of personal property in violation of 42 U.S.C. §12203.

103.    In carrying out Defendant's policies and practices as herein described, and unreasonably delaying and denying Plaintiffs' requests for reasonable modifications in violation of Plaintiffs' rights under the ADA, Defendant has acted knowingly and with deliberate indifference to harms substantially likely to occur.

104.    As a direct and proximate result of Defendant City of San Diego's ongoing unlawful acts and omissions, Plaintiffs have suffered and continue to suffer injuries, including emotional injuries and physical harms, and are entitled to compensatory damages, including damages for emotional distress. In addition, Plaintiffs have no adequate remedy at law and are therefore entitled to injunctive and declaratory relief, restitution and reasonable attorneys' fees and costs.

### FOURTH CLAIM FOR RELIEF
**Violation of Title III Americans with Disabilities Act
Against Defendants DREAMS FOR CHANGE and
DOWNTOWN PARTNERSHIP**

105.    Plaintiffs reallege and incorporate each and every allegation contained in The preceding paragraphs as though fully set forth herein.

106.    Title III of the ADA and its implementing regulations entitle individuals with disabilities to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. §12182(a); 28 C.F.R. §36.201(a).

107.    Places of public accommodation include a homeless shelter or other

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

social services center establishments. Lot B and Lot O are places of public accommodation covered by Title III of the ADA.28 C.F.R. §36.104.

108.    Title III requires public accommodations to make reasonable modifications to policies, practices, and procedures when necessary to afford equal access to goods, services, facilities, privileges, advantages or accommodations to people with disabilities. 42 U.S. Code §12182(b)(2)(A)(ii).

109.    Title III further requires that public accommodations remove barriers to access when readily achievable. The ADA also mandates that public accommodations make their transportation services accessible to individuals with disabilities. 42 U.S. Code §12182(b)(1)(A)(iii).

110.    Under 42 U.S.C. § 12203, it is unlawful to intimidate, threaten, coerce, or interfere with any individual for exercising their rights under the ADA, or to discriminate against any person for opposing practices made unlawful by the Act.

111.    Defendants have failed and refused to timely provide the necessary reasonable modifications requested by Plaintiffs; have failed to remove barriers to access where doing so would have been readily achievable; have failed to make their transportation services fully accessible; and have further utilized methods of administration that denied Plaintiffs full and equal enjoyment of the services offered.

112.    Defendants have responded to Plaintiffs' reasonable accommodation requests and complaints regarding accessibility with silence and with retaliatory conduct, including threats of eviction, eviction, and confiscation and disposal of Plaintiffs' personal belongings, further subjecting Plaintiffs to discrimination based on their disabilities.

113.    Defendants' conduct constitutes ongoing and continuous violations of the

114.    ADA, and unless restrained from doing so, Defendants will continue to violate the ADA in its operation of the Safe Sleeping program. This conduct, unless enjoined, will continue to inflict injuries for which plaintiffs have no adequate remedy at law.  Therefore, Plaintiffs are entitled to declaratory relief under section 308 of the

1  ADA, 42 U.S.C. §12188(a) as well as reasonable attorneys' fees sand costs, 42 U.S.C.
2  §12205.

### FIFTH CLAIM FOR RELIEF
**Disability Discrimination under FEHA – Failure to
Provide a Reasonable Accommodation
(Government Code §§12927, subd. (c)(1) and §12955, et.seq.)
Against All Defendants**

115.    Plaintiffs reallege and incorporate each and every allegation contained in The preceding paragraphs as though fully set forth herein.

116.    Government Code §12955(a) prohibits owners of housing accommodations from discriminating against any person because of his/her disability.

117.    Government Code §12955.3 defines "disability" to include "any physical or mental disability as defined in Section 12926." Section 12926, subdivision (j)(1) defines "mental disability" to include "any mental or psychological disorder or condition, such as, emotional or mental illness, that limits a major life activity."

118.    Any condition that limits almost any major life activity qualifies as a disability. "Major life activities" is "broadly construed" to cover "physical, mental, and social activities and working." (Gov. Code, §§12955.3, 12926, subd. (j)(1)(C).) As detailed herein, all Plaintiffs' physical and mental conditions make it difficult for them to sleep, work, and otherwise go about their daily lives and interfere with their full use and enjoyment of their housing and therefore qualify as disabilities under the FEHA.

119.    Anxiety, depression, PTSD, Unspecified Dissociative Disorder (UDD), ADHD, bipolar disorder, mania, neurodivergence, learning disabilities and Plaintiffs' other mental health conditions qualify as mental disabilities. "Numerous cases under state and federal law have held that depression and its related manifestations can meet the definition of disability under antidiscrimination laws." (*Auburn Woods I*, supra, 121 Cal.App.4th at pp. 1592-3; see also *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 258-9 [post-traumatic stress disorder qualified as a disability];

*Criado v. IBM Corporation* (1st Cir. 1998) 145 F.3d 437, 442 [plaintiff with adjustment disorder, ADD, and anxiety qualified as disabled.])

120.    The "Safe Sleeping Program" operated by Defendants at the two locations consisting of rows of tents placed on wooden pallets, bathroom and shower facilities and communal areas set up for meals, are structures occupied as or intended for occupancy by homeless persons as their residences and are therefore "housing accommodations" as defined by Government Code §13927(d) and covered by the provisions of the Fair Employment and Housing Act.

121.    Section 12927(c)(1) of the California Government Code defines housing discrimination to include the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations are necessary to afford individuals with disabilities an equal opportunity to use and enjoy a dwelling. Harassment and retaliation done in response to the request for such accommodations constitutes unlawful discrimination.

122.    Section 12955(f) of the California Government Code prohibits housing providers from harassing, evicting, or otherwise discriminating against individuals in retaliation for opposing unlawful housing practices, reporting such practices to law enforcement, participating in legal proceedings, or assisting others in exercising their housing rights.

123.    Title 2 California Code of Regulations §12176 requires housing providers to make reasonable accommodations unless doing so would impose an undue financial or administrative burden or fundamentally alter the nature of the housing program.

124.    Title 2 California Code of Regulations §12177 requires housing providers to engage in a timely, good-faith interactive process when a request for reasonable accommodation or modification is received and cannot be immediately granted.

125.    The interactive process facilitates the exchange of information to identify and implement a reasonable accommodation that ensures equal opportunity to use and enjoy a dwelling. Cal. Code Regs. Title 2, §12177. Good faith includes making an

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

honest effort to consider the request, seeking clarification if the disability or need is unclear, and proposing equally effective alternatives if the original request is not feasible. *Id.*

126.    A provider may not deny a request due to insufficient information without first requesting clarification and allowing a reasonable opportunity to respond. Cal. Code Regs. tit. 2, § 12177. Undue delay may constitute a denial, and failure to reach an agreement after reasonable efforts is effectively a denial. *Id.*

127.    Plaintiffs' requested reasonable accommodations are necessary to afford them an equal opportunity to use and enjoy their dwelling. Defendants either failed to respond, denied the requests outright, engaged in unreasonable delay, or otherwise refused to engage in the interactive process in violation of the California Fair Employment and Housing Act and implementing regulations.

128.    In retaliation for asserting their right to reasonable accommodations, Defendants engaged in retaliatory conduct against Plaintiffs including, but not limited to: harassment, threats of eviction and/or termination from the program, and eviction of Plaintiffs in retaliation for their reasonable accommodation requests, in violation of Cal. Gov't Code § 12955.

129.    Defendants' actions and omissions discriminated against Plaintiffs based on their disabilities, denying them equal use and enjoyment of housing and were in retaliation for Plaintiffs asserting their rights, in violation of Government Code §12927(c)(1), §12955(a), §12955(f), and Cal. Code Regs. Title 2, §12176 and §12177.

130.    As a direct and proximate cause of Defendants' unlawful failure and refusal to provide reasonable accommodations, Plaintiffs have suffered, continue to suffer and will continue to suffer damages and injury as described above.

131.    Plaintiffs have no adequate remedy at law and are therefore entitled to an injunction and other equitable remedies provided under Government Code §12989.2(a).

132.    Plaintiffs are entitled to declaratory and injunctive relief, as well as

compensatory and punitive damages, attorneys' fees, and costs, as set forth below.

## SIXTH CLAIM FOR RELIEF
### Disability Discrimination – Failure to Engage in the Interactive Process
### (Gov. Code §12927(c)(1); §12955(a); and §§12955.8(a) & (b))
### Against All Defendants

133.    Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

134.    Section 12955, subdivision (a) prohibits owners of housing accommodations from discriminating against any person because of his/her disability.

135.    Section 12927, subdivision (c)(1) defines "discrimination" to include "refusal to make reasonable accommodations in rules, policies, practices, or services when these accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling."

136.    Section 12955.8, provides that "[p]roof of an intentional violation of this article includes, but is not limited to, an act or failure to act … that demonstrates an intent to discriminate in any manner in violation of this part."

137.    The "Safe Sleeping Program" operated by Defendants at the two locations consisting of rows of tents placed on concrete slabs, bathroom and shower facilities and communal areas set up for meals, are structures occupied as or intended for occupancy by homeless persons as their residences and are therefore "housing accommodations" as defined by Government Code § 13927(d) and covered by the provisions of the Fair Employment and Housing Act.

138.    As detailed herein, Defendants violated the requirement to engage in the interactive process with Plaintiffs by ignoring reasonable accommodation requests, by refusing to engage in negotiations, delaying responses to requests for so long they were by default denied, by failing to have any or adequate standards for accommodations, and other such acts. Under the FEHA, a landlord faced with a request for accommodation by a tenant with a disability is obligated to "open a dialogue" with the tenant as "part of an interactive process in which each party seeks and shares

information." (*Auburn Woods I*, supra, 121 Cal.App.4th at p. 1598.) "If a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue. [Citation.]" (Ibid.).

139.    Defendants' refusal and/or failure to engage in the interactive process, refusal to negotiate with Plaintiffs regarding their reasonable accommodation requests, denying and withholding housing accommodations, and exiting/evicting them from the Lots constitute unlawful housing discrimination.

140.    As a direct and proximate cause of Defendants' unlawful failure and refusal to provide reasonable accommodations, Plaintiffs have suffered, continue to suffer and will continue to suffer damages and injury as described above.

141.    Plaintiffs have no adequate remedy at law and are therefore entitled to an injunction and other equitable remedies provided under Government Code §12989.2(a), in addition to declaratory and injunctive relief, as well as compensatory and punitive damages, attorneys' fees, and costs, as set forth below.

## SEVENTH CLAIM FOR RELIEF
### Violations of the California Unruh Act
### Against All Defendants

142.    Plaintiffs reallege and incorporate each and every contained allegation in the preceding paragraphs as though fully set forth herein.

143.    A violation of the right of any individual under the ADA is also a violation of the Unruh Act, California Civil Code §51(f). Defendant City of San Diego's homeless housing initiative "Safe Sleeping Program" operated by the City in conjunction with Defendants Dreams for Change and Downtown Partnership is a "business establishment" as defined by the Unruh Act, Ca. Civil Code §51.

144.    The Unruh Act guarantees, *inter alia*, that persons with disabilities are entitled to full and equal accommodations, advantages, facilities, privileges or services in all business establishments of every kind whatsoever within the jurisdiction of the

State of California.  The Unruh Act further provides that a violation of the rights of any individual under the ADA, 42 U.S.C. §§12101, *et seq.*, shall also constitute a violation of the Unruh Act. Defendants have violated the Unruh Act by, *inter alia*, denying Plaintiffs, who have disabilities, the full and equal accommodations, advantages, facilities, privileges or services offered by defendants. Defendants have further violated the Unruh Act by violating Title II of the ADA, 42 U.S.C. §§12132 *et seq.*, and the regulations promulgated thereunder, as alleged in Plaintiffs' Third Claim for Relief.

145.    Defendants acted intentionally to discriminate in public accommodations in violation of the Unruh Civil Rights Act, Civ. Code, §51(a) by denying Plaintiffs, who are individuals with disabilities, equal access to the "Safe Sleeping Program." Defendants' acts and omissions are also a violation of Title II and III of the ADA and are therefore a violation of Civ. Code §51(f).

146.    Defendants retaliated against Plaintiffs for asserting their right to request a reasonable accommodation under the ADA. Defendants' retaliation included, but were not limited to: acts such as threats of eviction, actual eviction, and the disposal of personal belongings, in violation of 42 U.S.C. §12203 and pursuant to California Civil Code § 51(f), also constitutes a violation of the Unruh Civil Rights Act.

147.    Defendants have violated the Unruh Act by, *inter alia*, failing to operate its services on a nondiscriminatory basis; failing to afford Plaintiffs access as necessary to the "Safe Sleeping Program" and failing to ensure that personnel are trained to proficiency regarding the nondiscriminatory provision of services to people with disabilities such as Plaintiffs.

148.    The Unruh Act violations by Defendants have been intentional in that Defendants have engaged in acts, practices or omissions that have the foreseeable effect of discriminating against homeless individuals with disabilities such as Plaintiffs.

149.    Pursuant to the remedies, procedures, and rights set forth in California Civil Code §52, plaintiffs judgment for actual damages, treble damages with a minimum statutory damage award of $4,000, and attorneys' fees as set forth below.

150.    Defendants are engaged in conduct of resistance to the full enjoyment of rights of people with disabilities as described herein. Plaintiffs are therefore entitled to preventative relief including a permanent or temporary injunction and other equitable relief. Ca. Civil Code §52(c)(3).

### EIGHTH CLAIM FOR RELIEF
**Violation of the Unfair Business Practices Act**
**[Bus. & Prof. Code §§17200 et seq.]**
**Against All Defendants**

151.    Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

152.    The above practices impose on Plaintiffs and other residents of the camps conditions of life unfit for human habitation, and thus constitute unfair business practices in violation of the Unfair Business Practices Act, Business and Professions Code §§17200 et seq.

153.    The above discriminatory conduct violates the Unruh Civil Rights Act, Cal. Civ. Code § 51, which prohibits discrimination by business establishments. Because these acts occurred in connection with the operation and administration of a publicly managed shelter program, and such conduct is expressly prohibited by law, it constitutes an unlawful business practice within the meaning of California Business and Professions Code § 17200. *Barquis v. Merchants Collection Assn.*, 496 P.2d 817 (Cal. 1972). *People v. McKale*, 602 P.2d 731 (Cal. 1979).

154.    The unlawful business practices of Defendants are likely to continue, and thus, they will continue to harm the public by risking the health and safety of Plaintiffs and other Camp residents and perpetuating discrimination based on disability. In addition, since diseases may spread beyond the residents of the camps and negatively impact public health, and dangers of fire can jeopardize entire cities, Defendants' unfair business practices present a continuing public threat. California has a compelling interest in eradicating discrimination and in providing shelters for unhoused individuals

that meet basic human needs to adequate food, safety, security, and shelter from the elements for its residents and that do not cause or spread disease or pose a fire hazard.

155.    As a direct result of Defendants' Unfair Business Practices including the conditions at the Camps, Plaintiffs have suffered injury in fact and have lost money and/or property, due to the unsafe and discriminatory conditions. Plaintiffs are therefore entitled to restitution for money or property lost.

156.    Unless Defendants are restrained by a permanent injunction and other relief, Plaintiffs and the general public will suffer great and irreparable injury in that they suffer, or continue to suffer shame, humiliation, mental suffering, physical harm and economic loss. There is no other adequate remedy at law because pecuniary damages would not afford adequate relief.

**NINTH CLAIM FOR RELIEF**
**Violation of California Government Code §11135**
**Against All Defendants**

157.    Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

158.    Section 11135(a) of California Government Code provides in relevant part:"[N]o person in the State of California shall, on the basis of ... disability, be unlawfully denied the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state."

159.    Section 11150 of the California Code of Regulations defines a "program or activity" as "any project, action or procedure undertaken directly by recipients of State support or indirectly by recipients through others by contracts, arrangements or agreements, with respect to the public generally or with respect to any private or public entity."

160.    Section 11150 of the California Code of Regulations defines "[ s]tate financial assistance" as "any grant, entitlement, loan, cooperative agreement, contract or any other arrangement by which a State agency provides or otherwise makes available aid to recipients…"

161.    The City of San Diego is funded directly by the State of California and receives financial assistance from the State of California sufficient to invoke the coverage of Gov. Code §§11135, et seq. The City of San Diego was and is the recipient of such funding and financial assistance at all times relevant to the claims asserted in this Complaint. Defendants Dreams for Change and Downtown Partnership are in receipt of funding from the City of San Diego that consists of or contains such funds.

162.    At all times relevant to this action, Plaintiffs were and are qualified individuals with disabilities within the meaning of Section 11135(c)(1) and meets the essential requirements for the receipt of the services, programs, or activities of Defendant's. Cal. Gov. Code §§1135; 12926(j).

163.    Defendants have refused and failed to provide Plaintiffs with full and equal access to their facilities, programs, services and activities as required by Gov. Code §11135, et seq.

164.    Plaintiffs have no adequate remedy at law. Unless the remedies and relief requested herein are granted, Plaintiffs will continue to be discriminated against and denied full and equal access to Defendant's facilities, programs, services and activities.

**TENTH CLAIM FOR RELIEF**
**Violation of the Disabled Persons Act**
**(California Civil Code §§54, 54.l and 54.3**
**Against All Defendants**

165.    Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

166.    Defendants' "Safe Sleeping Program" is comprised of lodging places or places of public accommodation under Civil Code §54.1.

167.    Defendant's actions and omissions as above stated, including the maintenance of discriminatory policies against people with disabilities, denied plaintiffs full and equal access as other members of the public, thereby discriminating against Plaintiffs based on disability in violation of Civil Code §§54 and 54.1.

168.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have suffered, continue to suffer and will continue to suffer damages and injury as described more fully above. Plaintiffs are therefore entitled to actual and statutory damages including treble damages as provided pursuant to Civil Code §54.3.

169.    Plaintiffs are currently not seeking injunctive relief under Civil Code §55 as that relief is otherwise available under other statutes.

**ELEVENTH CLAIM FOR RELIEF**
**Violation of Procedural Due Process**
**[Fourteenth Amendment; 42 U.S.C. §1983]**
**Against Defendant City of San Diego**

170. Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

171. Plaintiff Timothy Allen pleads this claim against all Defendants for violating Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

172.    The 14th amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." 42 U.S.C. §1983.

173.    At all relevant times, Defendants controlled and managed the "Safe Sleeping Program", including its operation, maintenance, and continued use of designated Camp locations for unhoused individuals including plaintiff Timothy Allen.

174.    Plaintiff Timothy Allen participated in the Safe Sleeping Program, which provided his only available shelter and protected him from the risk of arrest and incarceration associated with sleeping on the streets.

175.    Plaintiff Timothy Allen had and has a constitutionally protected property interest in continued participation in the "Safe Sleeping" program. His interest is

protected under the Due Process Clause because exclusion from the program resulted in immediate deprivation of access to basic necessities and exposed him to substantial risk of harm. *Am. Fed'n of Lab. v. Emp. Dev. Dep't*, 88 Cal.App.3d 815 (Cal. Ct. App. 2d Dist. 1979).

176.    A property interest under the Fourteenth Amendment is not limited to real estate, personal property, or money. Constitutionally protected property interests may also include government benefits on which individuals rely for survival. *Board of Regents v. Roth*, 408 U.S. 564 (1972). When such benefits are conferred by statute or policy and conditioned on specific eligibility criteria, they cannot be taken away without due process. *Id*. The government must provide an opportunity to be heard before terminating such benefits. *Id.* Failure to do so constitutes a violation of due process rights. See *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Skelly v. State Personnel Bd.*, 15 Cal.3d 194, 539 P.2d 774 (1975).

177.    Despite the seriousness of the deprivation and Plaintiff's protected property interests, Defendants suspended him from the program without advanced notice, and without providing an opportunity for hearing or appeal prior to being exited.

178.    As a result of this action, Mr. Allen was forced onto the streets with no access to alternative shelter. He has been exposed to lack of shelter and risk of arrest causing severe extreme emotional distress, worsening his anxiety and depression.

179.    Defendant's actions deprived Plaintiff of his right to procedural due process by failing to afford notice and an opportunity to be heard prior to terminating his access to shelter.

180.    Defendant's conduct reflects a broader policy, custom, or practice of summarily expelling residents from the "Safe Sleeping" program without due process protections, in violation of established constitutional standards. See *Goldberg v. Kelly*, 397 U.S. 254 (1970); *James v. City of Costa Mesa*, 700 F.3d 394 (9th Cir. 2012).

181.    As a direct and proximate result of the actions of staff at "B Lot" and the implementation of its unconstitutional policies and practices, Plaintiff Timothy Allen

has suffered significant emotional distress, including the exacerbation of his pre-existing depression and anxiety, due to the threat of losing his emotional support animal. Mr. Allen now resides outdoors in shrubbery adjacent to "B Lot" in an effort to avoid arrest. As a result, he continues to experience severe emotional distress and further deterioration of his mental health. Mr. Allen has suffered and continues to suffer irreparable harm and lacks an adequate remedy at law.

182.    Accordingly, he is entitled to declaratory and injunctive relief to prevent future violations. Plaintiff is also entitled to compensatory damages for the harm he has endured, attorneys' fees, and costs.

### TWELFTH CLAIM FOR RELIEF
### California Government Code Section 835
### Against Defendant City of San Diego

183.    Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs as though fully set forth herein.

184.    Plaintiffs reallege and incorporate each and every allegation in the preceding paragraphs as though fully set forth herein.

185.    Plaintiffs bring this cause of action under California Gov. Code §835.

186.    Defendants are liable for Plaintiffs' losses and injuries caused by a dangerous condition of public property. The "Safe Sleeping Program" encampments, "Lot B" and "Lot O", located on public lots operated by the City of San Diego, were in a dangerous condition at the time of the injuries, and this dangerous condition created a reasonably foreseeable risk of the kind of harm that Plaintiffs ultimately suffered. These dangerous conditions and risks continue to exist due to Defendant's actions and inactions.

///
///
///
///

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

187.     Further, Defendants created and/or had actual and/or constructive notice of the dangerous conditions a sufficient time prior to the injuries to have taken measures to protect against those conditions.

188.     Defendants controlled and managed the "Safe Sleeping Program" at all relevant times, including its overall operation, maintenance, and continued use as designated Camp locations for unhoused individuals.

189.     The Defendants own, operate, and are responsible for maintaining the City-owned lots used for the Safe Sleeping Program, including the tents, walkways, common areas, and any structural elements or onsite facilities.

190.     These City-owned lots were and continue to be in a poor and unsafe condition during the relevant period because Defendants failed to implement adequate pest control measures (leading to rodent infestation), failed to provide safe sanitation facilities, address extreme temperatures and weather hazards such as heat, cold, and flooding), and failed to improve dangerous and inaccessible terrain or remedy other known hazards.

191. The sites are also subject to harsh environmental conditions—including excessive heat and flooding—that Defendants have neglected to mitigate. For example, tents lack sufficient shade in the summer and are prone to flooding in the winter, compounding the danger and creating a heightened risk of illness or injury.

192.     The conditions of Defendants' "Safe Sleeping Program" constitute dangerous hazards that posed, and continue to pose, unreasonable risks of harm to Plaintiffs and other residents forced to remain on-site with no alternative housing or shelter.

193.     These risks resulted from Defendants' failure to:

- Provide or maintain adequate pest control and rodent abatement,
- Ensure sufficient and consistently sanitary restroom, washing, and hygiene facilities,
- Offer protection from extreme heat cold, and hazardous weather,

- Allocate adequate resources to keep the Property free from vermin and other health hazards, and

- Take mitigating measures to prevent fire from breaking out and control its spread;

- Promptly remedy the overcrowding and unsanitary conditions that exacerbated these dangers.

194.    The City's poor maintenance and lack of proper oversight of the Properties created a clear and foreseeable risk of harm to Plaintiffs. With no effective means to address infestations, temperature extremes, or lack of sanitation, the Properties remained in a condition that could—and did—lead to physical and emotional harm and continues to do so.

195.    Defendants are, and were, at all relevant times aware of these dangerous conditions, as evidenced by complaints from Plaintiffs and other residents for months (if not longer) before this lawsuit. Despite acknowledging the need to address rodent infestations, unsafe spacing of tents, unsanitary restrooms, and exposure to harsh weather, Defendants failed to timely and meaningfully remedy the situations. Specifically, Defendants neglected to:

- Implement timely and effective pest control services,

- Ensure adequate sanitation facilities,

- Provide reliable solutions or resources to mitigate extreme heat and flood risks,

- Provide reliable solutions or resources to mitigate risk of fire and ensure fire safety for residents,

- Enforce health and safety standards applicable to the Property,

- Supply the necessary funding for sustained improvements, and

- Establish or follow through with any long-term strategy to correct the unsafe conditions.

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

196.    These failures collectively contributed to the dangerous conditions for residents in the Safe Sleeping Program.

197.    Defendant City of San Diego was aware, or should have been aware, that these conditions posed a significant risk of harm to Plaintiffs and others compelled to reside there. By failing to act on that knowledge, Defendants proximately caused Plaintiffs' injuries arising from the dangerous condition of their property.

### THIRTEENTH CLAIM FOR RELIEF
**NUISANCE**
**Against All Defendants**

198. Plaintiffs reallege and incorporate each and every allegation contained in The preceding paragraphs as though fully set forth herein.

199.    Plaintiffs bring this claim pursuant to Civ. Code §3480 (Public Nuisance).

200.    Defendants' conduct caused the harm suffered by Plaintiffs by creating, maintaining, or failing to abate unsafe conditions in the City-operated "Safe Sleeping Program" encampments, thereby interfering with Plaintiffs' health, safety, and right to the comfortable enjoyment of life.

201.    The interference was substantial and unreasonable, and caused severe inconvenience and harm to Plaintiffs and others similarly situated. Any ordinary reasonable person facing rodent infestations, unsanitary facilities, and exposure to extreme weather conditions would find such interference offensive and intolerable.

202.    Defendants' conduct caused this interference by failing to maintain safe and habitable sleeping areas, neglecting adequate pest control, and not remedying excessive heat. Cold, flooding or fire risks—all of which substantially interfered with Plaintiffs' ability to live safely at the encampments.

203.    Plaintiffs did not consent, nor did they ever consent, to being subjected to unsafe, unsanitary, and overcrowded conditions in the City-owned lots.

///

///

204.    Defendants knew or should have known that failing to remedy the conditions described herein—such as rodent infestation and inadequate sanitation—would likely result in harm to Plaintiffs and other residents.

205.    Defendants' actions and/or failures to act were unreasonable and directly caused the harm suffered by Plaintiffs, thus constituting a public nuisance.

**FOURTEENTH CLAIM FOR RELIEF**
**NEGLIGENCE**
**Against All Defendants**

206.    Plaintiffs reallege and incorporate each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

207.    Plaintiffs bring this cause of action based on Defendants' negligent conduct in establishing and operating the "Safe Sleeping Program" encampments on City-owned property.

208.    Defendants owed Plaintiffs a duty of reasonable care. By operating and promoting the Safe Sleeping Program, the City undertook responsibility for providing at least minimally safe conditions for unhoused individuals, including basic protection from foreseeable hazards, adequate sanitation, pest control, and weather-related safety measures. Having encouraged or required Plaintiffs to reside on City property, Defendants assumed the obligation to exercise reasonable care in managing and maintaining that location.

209.    Defendants breached their duty by failing to provide and maintain safe, sanitary, and suitable living conditions. Specifically, Defendants:

- Neglected to implement effective pest control measures, resulting in severe rodent infestation;

- Failed to maintain adequate restroom and hygiene facilities, exposing residents to unsanitary conditions;

- Did not address known weather hazards—extreme heat in the summer, cold and flooding in the winter—thereby leaving Plaintiffs vulnerable to heatstroke, cold exposure, and other weather-related injuries;

- Overcrowded the tents, placed them too close together, and did not provide adequate spacing, risking the rapid spread of infestation, illness, fire, or other harms; and

- Ignored or inadequately responded to repeated complaints about unsafe conditions, despite having the authority and resources to address or mitigate them.

210.    Defendants' breach of their duties proximately caused Plaintiffs' injuries. Plaintiffs suffered (and continue to suffer) harm to their health and well-being due to rodent bites and droppings, potential water contamination, exposure to extreme weather, inadequate sanitation, and stress arising from overcrowded conditions and unaddressed hazards. But for Defendants' negligent maintenance and oversight of the Safe Sleeping Program property, Plaintiffs would not have experienced these injuries, or at a minimum, the risk of injury would have been significantly reduced.

211.    As a direct and foreseeable result of Defendants' negligence, Plaintiffs sustained physical injuries (including exposure to vermin-borne illnesses), emotional distress, pain and suffering, and other harms associated with enduring these unsafe, substandard living conditions. Plaintiffs also suffered the loss of personal property due to flooding or contamination, further compounding the harm caused by Defendants' negligent acts and omissions.

212.    By failing to use reasonable care to keep City-controlled sleeping sites safe and by failing to timely respond to known dangerous conditions, Defendants' negligence directly caused Plaintiffs' injuries. Consequently, Plaintiffs seek all appropriate damages, including compensatory damages for physical, mental, and emotional harm, in an amount according to proof at trial.

///

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs ask that the Court:

1)  Declare that the Defendants' actions and omissions alleged herein are violations of the Fair Housing Act, 42 U.S.C. §3604 et seq.; substantive and procedural due process under the 14th Amendment, 42 U.S.C. §1983; Title II of the ADA, 42 U.S.C. §12132; Title III of the ADA, 42 U.S.C. §12182; California Fair Employment and Housing Act, California Government Code §12955; the Unruh Act, Civil Code §51 et seq.; the Unfair Business Practices Act, California Business & Professions Code §§17200 et seq.; California Government Code §11135; and/or California Government Code §835;

2)  Issue preliminary and permanent injunctions pursuant to 42 U.S.C. §3613, 42 U.S.C. §12133, 29 U.S.C. §794(a); 42 U.S.C. §1983; 42 U.S.C. §12188; Ca. Civ. Proc §526, Cal. Civ. Code §52, Cal. Gov. Code §12989.2; Cal. Gov. Code §11139, and Cal. Bus. & Prof. Code §17203 as necessary to cause cessation of, and prevent further, such actions by defendants;

3)  Order that Defendants take appropriate affirmative action to ensure that the activities complained of above are remedied and not engaged in again by them or any of their agents, employees, or volunteers;

4)  Retain jurisdiction over the Defendants until such time as the Court is satisfied that Defendants' unlawful policies, practices, acts and omissions complained of herein have ceased and cannot recur;

5)  Award to Plaintiffs all appropriate damages, including actual, statutory, and treble damages, and exemplary and punitive damages according to proof;

6)  Award to Plaintiffs reasonable attorney's fees pursuant to 42 U.S.C. §1988; 42 U.S.C. §12205, 29 U.S.C. §794a(b); 42 U.S.C. §12205; Ca. Gov. Code §11139; Cal. Civ. Code §52; and Cal. Code of Civ. Proc. §1021.5.

7)  Award to Plaintiffs reimbursement of expert witness fees incurred pursuant to Cal. Gov. Code §12989.2(a) and 42 U.S.C.§1983;

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

1    8)  Award to Plaintiffs costs of suit;

2    *and*

3    9)  Such other and further relief that the Court deems just and proper.

4

5                          **DEMAND FOR JURY TRIAL**

6         Plaintiffs hereby demand a jury trial on all issues that may be tried by a jury.

7

8    Dated: August 25, 2025

9

10   Respectfully submitted,

11

12   *Ann E Menasche*

13   By: Ann E. Menasche (SBN 74774)
     LAW OFFICE of ANN E. MENASCHE

14   1901 First Avenue, Suite 100

15   San Diego, California 92101
     (619)798-6835

16   ann@bulldogforjustice.com

17   Geneviéve L. Jones-Wright, Esq., LL.M. (SBN 235168)

18   **COMMUNITY ADVOCATES FOR JUST AND MORAL GOVERNANCE**

19   6549 Mission Gorge Rd., Suite 379
     San Diego, California 92120

20   Phone: (619) 736-0179

21   Email: Director@MoralGovernance.org

22   **DREHER LAW FIRM**

23   Robert Scott Dreher (SBN 120527)
     350 West Ash Street, Suite 101

24   San Diego, CA 92101

25   Phone: (619) 230-8828
     Email: Scott@DreherLawFirm.com

26

27   **GRUMET LAW**
     Elizabeth Grumet, Esq. (SBN 276029)

28   1901 First Avenue, Suite 414

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF

San Diego, CA 92101
Phone: (760) 809-5768
Email: Liz@GrumetLaw.com

Brian L. Burchett (SBN1347570
**THE BURCHETT LAW FIRM, PC**
605 C Street, Suite 300
San Diego, California 92010
Phone: (619) 239-8431
Fax: (619) 639-1125
Email: brian@theburchettlawfirm.com

Attorneys for Plaintiffs

COMPLAINT FOR INJUNCTIVE, DECLARATORY, & MONETARY RELIEF